**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**AXIS REINSURANCE COMPANY,**

        **Plaintiff,**

**v.**                                                                                   **Case No. 8:08-cv-569-T-33TBM**

**TRAVIS RESMONDO,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the court for a Report and Recommendation on **Plaintiff's Motion For Summary Judgment, Statement of Undisputed Facts and Memorandum of Law** (Doc. 29).[1] Defendant has filed a response in opposition (Doc. 37), to which Plaintiff has replied (Doc. 45). In addition, the parties have filed deposition transcripts, affidavits, and other documentary evidence in support of their positions. *See* (Docs. 31, 33, 38, 39). Oral arguments on the motion were conducted on April 13, 2009.

I.

The undisputed facts reveal the following. Plaintiff, Axis Reinsurance Company ("Axis" or "Plaintiff"), is a New York corporation licensed to transact business in Florida. It maintains its principal place of business in New York, New York. Defendant, Travis Resmondo ("Resmondo" or "Defendant"), is a Florida resident.

---

[1]On November 10, 2008, Plaintiff filed his "Statement of Undisputed Facts and Memorandum of Law," which is identical to his motion for summary judgment. (Doc. 32).

On April 6, 2007, Resmondo purchased a 2006, 40-foot Baja 405, Hull Id AGC59007H506 (the "vessel") from Thunder Marine. Prior to purchasing the vessel, a Thunder Marine salesman picked up Resmondo, his fiancé, and a friend from Anna Maria island for a sea trial. The salesman took them to a restaurant in St. Petersburg and then brought them back to Anna Maria; according to Resmondo, they were on the boat for a couple of hours. Also prior to purchasing the vessel, Resmondo indicated that he had seen some scraping on the bottom of the vessel's engines and admitted that the bottom of the vessel may have been scraped when he purchased it. Resmondo said that he asked the Thunder Marine salesman about this and was told that it was normal. Resmondo admitted that he had limited experience with boats and only gave the boat a cursory visual examination. Thunder Marine had previously used the vessel for demonstration purposes and it had taken the vessel on one or more trips to southwest Florida. At the time of purchase, Thunder Marine representative(s) assisted Resmondo in making arrangements for placement of marine insurance coverage on the vessel, including hull and machinery insurance coverage. The marine insurance coverage was provided by Axis, via policy number S19446602 (the "contract" or "policy"). The effective date of the insurance contract was the date of purchase. The $5,792.00 premium was timely paid.

On Saturday, April 28, 2007, Resmondo made his initial voyage on the vessel. Approximately one to two hours after Resmondo began operating the vessel, he heard a loud "popping" noise from the vessel's main engines, and engine alarms on the control panel sounded. Resmondo called for vessel assistance, but the vessel assistance company refused to tow the vessel. Resmondo turned off the vessel's second engine after it began overheating.

He eventually got the vessel to an unmanned marina where he tied it to a dock and left it with a note. The vessel's bilge pumps were in the "on" position but Resmondo did not connect the vessel to electrical shore power. At that time, the vessel was afloat and appeared to be in normal condition aside from the engine problems. Resmondo had not operated the vessel at full speed and did not hit anything. Nor had he grounded or beached the vessel. As far as Resmondo knew, the motors had not come into contact with anything.

On Sunday, April 29, 2007, Resmondo spoke with the dock master by telephone and was not told that his vessel was sinking or taking on water. Resmondo also was in contact with the vessel assistance company and Thunder Marine to make arrangements for the vessel to be towed to Thunder Marine's facility to determine the cause of the engine problems and initiate repairs. As a result of these conversations, the vessel was to be towed to Thunder Marine on the morning of April 30, 2007.

On Monday, April 30, 2007, the marina dock master called Resmondo around 7:00 a.m. and told him the vessel was taking on water and sinking. The vessel sank and ultimately had to be refloated before it could be taken to dry storage. While in dry storage, the vessel's hull buckled as a result of the accumulation of rain water in tarps covering the vessel.

The parties dispute what caused the vessel to sink. According to Axis, the sinking was caused by the failure of the port main engine assembly's gimbal ring resulting from wear and tear, gradual deterioration, and/or manufacturing defect. Resmondo has indicated that he does not know what caused his vessel to sink.

Axis subsequently retained Smith Marine Survey, Inc. ("Smith Marine") to investigate the sinking of Resmondo's vessel. John Smith, the president of Smith Marine,

conducted the investigation. By Smith's declaration, he is a marine surveyor, appraiser, marine insurance claims adjuster, and marine accident investigator with over thirty (30) years of experience. His findings, opinions, and conclusions with respect to the sinking of Resmondo's vessel are set forth in a report dated November 5, 2007. *See* (Doc. 31-2 at 9-22). According to Smith, the chain of events that led to the sinking of the vessel are as follows. While owned and used by Thunder Marine as a demonstrator, the vessel sustained a significant grounding.[2] When this happened, the gimbal ring on the port outdrive was over-stressed and it sustained a partial fracture. The fracture started at a defect in the gimbal ring, near the lower steering pivot. The partial fracture exposed clean metal to seawater and the exposed clean metal corroded over a significant period of time. After this partial fracture occurred, the vessel continued operation with the gimbal ring in its weakened state. Resmondo bought the vessel and it was delivered to him in a defective condition. On his first voyage, the gimbal ring broke all the way through at the lower steering pivot pin area. The gimbal ring twisted sideways, causing unequal lateral stresses on the bell housing tilt pins. That caused the outdrive bell housing to break. The broken bell housing cut through the rubber universal joint bellows, which caused water to enter the vessel. The bilge pump removed water from the vessel until the vessel's battery was exhausted and then it quit. Thereafter, the vessel continued to flood and then it sank. The gimbal ring failure occurred over a period of time and did not result from single event. The bell housing failure was a singular event that occurred as a result of the increased load after the gimbal ring failed.

---

[2]Smith's basis for concluding there had been a grounding was his observation that the paint and the aluminum on both outdrive lower units and their protective skegs had been scratched and the gelcoat on the hull bottom had been scratched. (Doc. 31-2 at 16-17).

Resmondo made a claim for actual and incidental damages to the vessel including an estimated cost of repair of $125, 000.00.[3]

On February 19, 2008, Axis brought the instant declaratory action in admiralty against Resmondo to determine his rights and liabilities arising from the insurance contract. In Count I (Express Contract Exclusion), Axis alleges that the sinking of the vessel resulted from wear and tear, gradual deterioration, and a manufactures's defect, and the vessel's hull failure resulted from wear and tear, gradual deterioration, design defect, and a manufacturer's defect, and thus any and all damages arising from, or relating to, the sinking and/or hull failure are excluded from coverage by the express terms of the contract. In Count II (Lack of Fortuity), Axis alleges that, pursuant to the general maritime law, the contract does not cover non-fortuitous or inevitable losses and any and all damages arising from or relating to the sinking and/or hull failure were inevitable, non-fortuitous losses and thus are not covered by the contract. In Count III (Breach of Implied Warranty of Seaworthiness), Axis alleges that the general maritime law imposes a warranty of seaworthiness at the moment of attachment of the marine insurance contract, this warranty is absolute in nature and does not require knowledge of an unseaworthy condition on the part of the insured to prevent attachment of the marine insurance policy, and the port engines's gimbal ring was fractured on the effective date of the contract and was an unseaworthy condition. Accordingly, the contract is void *ab initio*.

---

[3]On November 30, 2007, Resmondo received a check from an Axis agent in the amount of $4,950.45 for a claim of damage to his vessel that occurred on October 1, 2007. (Doc. 38-2). I am unable to ascertain the nature of this claim.

By its instant motion, Axis urges that summary judgment should be granted in its favor because (1) the damages arising from or relating to the sinking of the vessel are specifically excluded from coverage by the contract and/or non-fortuitous and thus not covered by the contract, and (2) the vessel was unseaworthy and thus the contract was void from its inception. (Doc. 29). Resmondo counters that genuine issues of material fact exist which preclude the entry of summary judgment. (Doc. 37). In reply, Axis urges that contrary to Resmondo's contention that Florida law applies, federal law governs the question of warranty and, in any event, even under Florida law it prevails because Resmondo's actions increased the hazard while the vessel was under his control. It further denies that the fracture of the gimbal ring was a latent defect covered under the policy. (Doc. 45).

II.

The standard for granting summary judgment motion in an admiralty case is identical to that applied in non-admiralty cases. *Napier v. F/V DEESIE, Inc.*, 454 F.3d 61, 66 (1st Cir. 2006) (citing *Cerqueira v. Cerqueira,* 828 F.2d 863, 864-65 (1st Cir. 1987)).

The court shall grant summary judgment for the moving party only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324; *Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir. 1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. *Perkins v. Sch. Bd. of Pinellas County*, 902 F. Supp. 1503, 1505 (M.D. Fla. 1995). It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2).

When deciding a motion for summary judgment, "[i]t is not part of the court's function . . . to decide issues of material fact, but rather determine whether such issues exist to be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." *Hairston*, 9 F.3d at 919 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. *Hairston*, 9 F.3d at 921; *see also Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997). All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

III.

Marine insurance policies are maritime contracts within federal admiralty jurisdiction. *Morrison Grain Co. v. Utica Mut. Ins. Soc.*, 632 F.2d 424, 428 n.4 (5th Cir.

7

1980) (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).[4]  Nonetheless, unless

there is a federally established admiralty law, i.e., an entrenched federal maritime precedent

on point, state law generally applies.  *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348

U.S. 310, 320-21 (1955); *Kilpatrick Marine Piling v. Fireman's Fund. Ins. Co.*, 795 F.2d 940,

948 (11th Cir. 1986); *Aetna Ins. Co. v. Dudney*, 595 So.2d 238, 239 (Fla. Dist. Ct. App.

1992).  As explained by the Eleventh Circuit, "when neither statutory nor judicially created

maritime principles provide an answer to a specific legal question, courts may apply state law

provided that the application of state law does not frustrate national interests in having

uniformity in admiralty law."  *All Underwriters v. Weisberg*, 222 F.3d 1309, 1312 (11th Cir.

2000) (quoting *Coastal Fuels Mktg., Inc. v. Florida Express Shipping Co.,* 207 F.3d 1247,

1251 (11th Cir. 2000)).[5]

## A.

Here, I begin with Count III (Breach of Implied Warranty of Seaworthiness).  Axis

urges the entry of summary judgment in its favor is appropriate on this count because

Resmondo breached the absolute implied warranty of seaworthiness thereby rendering the

---

[4]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[5]*See also Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 223 (1986) ("[t]he extent to which state law may be used to remedy maritime injuries is constrained by a so-called 'reverse--Erie' doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards."); *Steelmet, Inc. v. Caribe Towing Corp.*, 779 F.2d 1485, 1488 (11th Cir. 1986) ("One must identify the state law involved and determine whether there is an admiralty principle with which the state law conflicts, and, if there is no such admiralty principle, consideration must be given to whether such an admiralty rule should be fashioned.  If none is to be fashioned, the state rule should be followed.").

insurance policy void as a matter of law. Relying on *Employers Insurance of Wausau v. Occidental Petroleum Company*, 978 F.2d 1422 (5th Cir. 1992), and *Gulfstream Cargo, Ltd. v. Reliance Insurance Co.*, 409 F.2d 974 (5th Cir. 1969), Plaintiff contends that the American Rule (with respect to seaworthiness under general maritime law) imposes an absolute warranty of seaworthiness that attaches at the inception of the insurance policy and the knowledge of the insured is irrelevant. Plaintiff maintains that the vessel was unseaworthy at the time Defendant obtained the insurance policy because it is undisputed that the gimbal ring was fractured at that time and the fractured gimbal ring rendered the vessel unseaworthy. (Doc. 29 at 8-9).

In response, Resmondo does not dispute that under the rules of general maritime law applicable to marine insurance in general and hull/property insurance on vessels in particular, a warranty exists that the vessel should be in a seaworthy condition at the time the insurance becomes effective. However, citing *Employers Ins. of Wausau v. Avondale Shipyards*, 1992 AMC 477 (E.D. La.1991) and *Tropical Marine Products, Inc. v. Birmingham Fire Insurance Company of Pennsylvania*, 247 F.2d 116 (5th Cir. 1957), he urges that the seaworthiness warranty is not absolute and that the breach of a warranty of seaworthiness at the inception of the policy voids the policy only if the vessel owner has prior knowledge of the unseaworthy condition. Even if the warranty is absolute (as urged by Plaintiff) and does not require knowledge on the part of the vessel owner, Resmondo urges that he may avoid application of this rule because there is no evidence establishing that the vessel was not reasonably fit for its intended purpose, that is seaworthy, on the effective date. In support, he cites evidence establishing that the vessel had been operated on various occasions by Thunder Marine

without difficulty or incidence and the vessel operated properly and normally on April 28, 2007, until the gimbal ring fractured. As such, Defendant urges the court to reject Plaintiff's contention that the insurance policy was void *ab initio* due to breach of a warranty of seaworthiness at the inception of the policy. (Doc. 37 at 11-12).

Federal law governs the consideration of the warranties of seaworthiness implied in time hull insurance policies. *See Employers Ins. of Wausau,* 978 F.2d at 1432 n. 9. The warranty of seaworthiness means that the vessel is reasonably fit for the intended use. *St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, No. 06-60889-CIV, 2008 WL 4221635, *5 (S.D. Fla. May 6, 2008), *vacated in part on other grounds*, 561 F.3d 1191 (11th Cir. 2009). Federal maritime law implies two warranties of seaworthiness in a time hull insurance policy. *Employers Ins. of Wausau,* 978 F.2d at 1431. The first of these warranties is the absolute implied warranty of seaworthiness, which applies at the inception of the policy. *Id.* To succeed in establishing this warranty, the insurer is not required to demonstrate that the insured had knowledge of the unseaworthy condition or that the insured was somehow at fault in not discovering the unseaworthy condition. *Id.* at 1436. Rather, it is enough to discharge the insurer and void the policy if the vessel is in fact not seaworthy at the inception of the policy. *Id.* Thus, the insured breaches this warranty if the vessel is in fact unseaworthy when the policy becomes effective. *Id.* at 1432. The second of these warranties is the so-called negative implied warranty, under which the insured promises not to knowingly send a vessel to sea in an unseaworthy condition. *Id.* at 1431-32. This warranty applies only after the policy attaches and continues through the policy. *Id.* at 1431. To find a breach of this warranty, the insured must demonstrate that the insured (the owner of the vessel) had

knowledge of the unseaworthy condition of the vessel. *Id.* at 1432. At issue here is the first warranty, i.e., that of the absolute implied warranty of seaworthiness, which Plaintiff contends Defendant breached due to the existence of the partially fractured gimbal ring at the inception of the insurance policy which rendered the vessel unseaworthy.

The question of whether or not a vessel is unseaworthy is ordinarily a question of fact for the trier of fact to determine. *Johnson v. Bryant*, 671 F.2d 1276, 1279 (11th Cir. 1982); *Bonura v. Sea Land Serv., Inc.*, 505 F.2d 665, 667 (5th Cir. 1974); *Aguirre v. Citizens Cas. Co. of N.Y.*, 441 F.2d 141, 144 (5th Cir. 1971); *Morales v. City of Galveston*, 291 F.2d 97, 98 (5th Cir. 1961). The insurer bears the burden of establishing that the vessel was unseaworthy at the moment the policy attached. *Employers Ins. of Wausau,* 978 F.2d at 1436, n.14.

In the light most favorable to Defendant, there exists genuine and material issues of fact as to whether the partially fractured gimbal ring rendered the vessel unseaworthy (not reasonably fit to use as a pleasure craft) at the outset of the policy.[6] Plaintiff's expert, Mr. Smith testified that, in his opinion, the initial fracture of the gimbal ring existed prior to April 6, 2007, the date on which Defendant purchased the vessel and the Axis insurance policy became effective. (Doc. 31-2 at 9-10). Smith, however, did <u>not</u> offer an opinion as to

---

[6]While not raised by the parties, there is reason to question whether, under general maritime law, the traditional warranty of seaworthiness ought to apply to a pleasure craft given that the historical development of the warranty is rooted in a commercial context. *See, e.g.*, *Mathis v. Hanover Ins. Co.,* 192 S.E.2d 510, 512 (Ga. Ct. App. 1972) ("We do not believe the warranty of seaworthiness under traditional maritime law can be read into an 'All Risks Yacht Policy' in which use of the vessel is restricted to private pleasure."); *Johnson Bros. Boat Works v. Conrad*, 156 A.2d 175, 179 (N.J. Super. Ct. Law Div. 1959) (expressing "grave doubt" that warranty of seaworthiness should be applied to small pleasure crafts). My research reveals no federal case law on point.

whether or not the partially fractured gimbal ring rendered the vessel unseaworthy at the time the policy attached.  And, Defendant disputes Smith's ultimate conclusion.  Although Defendant does not rebut the conclusion with that of his own expert, his testimony reveals that immediately prior to the time the policy attached, the vessel appeared to be in proper and normal operating condition and had in fact been operated on various sea trials, including one with Defendant that lasted from two to two and half hours at the time of purchase.  (Doc. 33-2 at 6).  Consequently, because there is a factual dispute as to whether the partially fractured gimbal made Defendant's vessel reasonably unfit for use as a pleasure craft at the inception of the insurance policy, summary judgment as to Count III is appropriately denied.

## B.

Axis also argues that all damages arising from or relating to the vessel's sinking were inevitable, non-fortuitous losses and, pursuant to the general maritime law, the contract does not cover such non-fortuitous losses.[7]  Referencing its expert's testimony, Axis urges that the sinking was inevitable because the port engines's gimbal ring failed due to wear and tear, corrosion, and gradual deterioration.  By this argument, Resmondo has not and cannot contest that the vessel sustained a substantial grounding, that such caused the gimbal ring to overstress and fracture, and that this fracture lead to wear and corrosion of the gimbal ring which eventually led to the boat sinking.  Indeed, Resmondo has testified that he has no idea what caused the motor damage and he has nothing in addition to or contrary to the Plaintiff's

---

[7]In support thereof, Plaintiff cites to *Great Lakes Reinsurance (UK) PLC v. Soveral*, No. 05-80923-CIV-RYSKAMP/VITUNAC, 2007 WL 646981, at *4 (S.D. Fla. Feb. 27, 2007), and *International Ship Repair and Marine Services, Inc. v. St. Paul Fire and Marine Insurance Company*, 944 F. Supp. 886, 892 (M.D. Fla. 1996).

expert report. In sum, Plaintiff contends that, because the sinking was the result of wear, tear, and corrosion of the gimbal ring and was not a fortuitous event, there is no coverage. (Doc. 29 at 6-8).

In response, Resmondo agrees with Plaintiff's recitation of the applicable law, but urges that by the expert's report, the initial fracture to the gimbal ring and the subsequent complete fracture were due to a marine incident (grounding) that occurred prior to his ownership and there is no evidence that the fractures were due to wear and tear or any intentional conduct by Resmondo. He disputes the expert's conclusion that the complete fracture of the gimbal ring was the proximate cause of the sinking, which he blames on the failure of the bilge pumps when the battery died, and he concludes that there is no legal or factual basis for denying coverage as a non-fortuitous event. (Doc. 37 at 9-11).

The parties agree that this insurance policy is an "all risks" policy. In particular, Part D-1 of the policy states that Axis will provide coverage for all accidental direct physical loss to the insured property, except as specifically excluded in the policy. (Doc. 1-2 at 7). The policy does not define the term accidental. However, the parties' instant pleadings reflect an agreement that the term accident is synonymous with fortuitous. Courts likewise understand this language to mean coverage for a fortuitous loss. *See St. Paul Fire & Marine Ins. Co.*, 2008 WL 4221635, at *3 (citing *Morrison Grain Co.*, 632 F.2d at 431).

Under Florida law, recovery under an all-risk insurance policy is allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding a loss from coverage. *See Fayad v. Clarendon Nat'l Ins. Co.*, 899 So.2d 1082, 1086 (Fla. 2005); *Int's Ship Repair & Marine Servs., Inc.*, 944 F. Supp. at

892. As such, the insured is typically required to show that the loss or damage resulted from a fortuitous event. *See Int's Ship Repair & Marine Servs., Inc.*, 944 F. Supp. at 892. Whether a loss is fortuitous and whether the proximate cause of the loss is within the policy coverage are generally questions of fact rather than ones of law. *See* 9a Couch on Ins., § 137:16 (2008); *but see Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, 866 F.2d 71, 77 (3d Cir. 1989) (providing that fortuity is a question of law for court to determine).

The decision in *International Ship Repair and Marine Services, Inc.,* is instructive on the matter of fortuity:

> The Restatement of Contracts, Section 291, comment a (1932), defines a fortuitous event as: an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, such as the loss of a vessel, provided that the fact is unknown to the parties. In contrast, "[a] loss is not considered fortuitous if it results from an inherent defect in the object damaged, from ordinary wear and tear, or from the intentional misconduct of the insured. However, loss due to the negligence of the insured or his agents has generally been held to be fortuitous and, absent express exclusion, is covered by an all risks policy." *Goodman v. Fireman's Fund Ins. Co.,* 600 F.2d 1040, 1042 (4th Cir.1979). *See Sipowicz v. Wimble,* 370 F. Supp. 442, 446 (S.D. N.Y.1974) ("[F]ortuitous events are accidents and casualties of the seas, unforeseen and unexpected events, and [are not] ... losses occasioned by the incursion of water into a vessel's hull owing to the defective, deteriorated or decayed condition of the hull or ordinary wear and tear"). In any case, the burden of demonstrating a fortuitous event is not an onerous one. More importantly, courts which have considered the question have rejected the notion that the insured must show the precise cause of loss to demonstrate fortuity. *Morrison Grain,* 632 F.2d at 431. *See Texas E. Transmission,* 579 F.2d at 564.

944 F. Supp. at 892-93. Thus, a loss may be deemed fortuitous or accidental where it was

unforseen, unexpected, unintended, unavoidable, or caused by the insured's own negligence.

*Great Lakes Reinsurance (UK) PLC*, 2007 WL 646981, at *4. Losses are not fortuitous,

however, where they result from an inherent defect in the object damaged, from ordinary wear

and tear, or from the intentional misconduct of the insured. *See id.*

    On the matter of the cause for this loss, Plaintiff's expert reported:

> The probable cause of the failure that sank Mr. Resmondo's
> vessel was a metal fracture that occurred before he bought
> the boat. That was a wear and tear problem. He did not
> have an accident.

(Doc. 31-2 at 9). Smith later opined, in conclusion, that:

> This vessel sank due to the significant failure of the port
> outdrive. That was caused by wear and tear over time. That
> failure began before Mr. Resmondo bought the vessel.

(Doc. 31-2 at 20).[8]

    This case is not unlike that in *St. Paul Fire & Marine Insurance Company*. There

the court stated, "[t]o determine whether the loss as a result of the partial sinking is covered

under the Policy, we must apply the doctrine of probable cause." *St. Paul Fire & Marine Ins.*

*Co.*, 2008 WL 4221635, at *3 (citing *Lanasa Fruit S.S. & Importing Co. v. Universal Ins.*

---

[8]As set forth above, the chain of events supporting Smith's conclusions are more
intricate. Thus, according to Smith, the chain of events leading to the sinking begins with the
partial fracture of the port outdrive gimbal ring, which was caused by the significant
grounding that occurred prior to Resmondo purchasing the vessel. The fracture faces were
then exposed to seawater over a period of time and corroded. Eventually, the weakened
gimbal ring fractured all the way through and twisted sideways. That caused unequal lateral
stresses on the bell housing tilt pins and caused the outdrive bell housing to break. The
broken bell housing cut through the rubber universal joint bellows causing water to enter the
vessel. (Doc. 31-2 at 20-21).

*Co.,* 302 U.S. 556, 562 (1938)).  Examining the facts, the court found that the proximate cause of the loss was the failure of a hose barb which evidence showed resulted from corrosion.  Since corrosion was an excluded cause under the policy, the loss was not covered. Here, the undisputed evidence is that the water intrusion and ultimate sinking of the vessel was caused by the failure of the gimbal ring and that such failed due to a gradual deterioration resulting from wear, tear, and corrosion.  When the gimbal ring finally gave way, the forces at work damaged the outdrive's bell housing which caused a puncture in the universal joint bladders which permitted water into the vessel.  In these matters, proximate cause "is the efficient cause and not a merely incidental cause which may be nearer in time to the result." *Lanasa Fruit S.S. & Importing Co.*, 302 U.S. at 562.  By the undisputed evidence, the failure of the gimbal ring was the efficient cause of the sinking, although other events were also necessary for it to occur.  Resmondo offers no contrary evidence on the matter of probable cause or to the expert opinion that the failure of the gimbal ring was ultimately due to wear, tear and corrosion.  At best, he can argue with the expert's conclusions and urge that it does not necessarily follow that the failure of the worn gimbal ring would cause the water intrusion resulting in the sinking of the vessel.  Perhaps that is so in the abstract, but that does not alter the undisputed evidence on causation now before the court.  Even accepting that the burden of demonstrating a fortuitous event is not an onerous one, case law makes clear that losses arising from ordinary wear and tear are not fortuitous events.  Here, I conclude that the efficient cause of the loss was the corroded and worn gimbal ring, not some accidental event, and, as a consequence, the loss is not covered under this marine policy.

The motion as for the claim at Count II should be granted on this ground.

C.

As for the claim of express contract exclusions set forth in Count I, I also conclude that Resmondo loses under the wear and tear, gradual deterioration, and corrosion exclusion of this marine insurance policy. In Count I, Axis alleges that the partial sinking and losses were the result of wear, tear, corrosion and gradual deterioration and manufacturers's defect and thus excluded under the policy.[9] On this motion, it argues that even if Resmondo can demonstrate a fortuitous event under the policy, there is no coverage because the vessel was damaged prior to the contract and because the contract specifically excludes loss resulting from wear and tear, gradual deterioration, and/or corrosion.[10] As noted, the parties agree that the policy at issue is an all risks policy. Under Florida law, once coverage is established, the burden shifts to the insurer to prove that the loss arose from a cause that is excluded under the policy. *Int'l Ship Repair & Marine Servs., Inc.*, 944 F. Supp. at 886 (applying Florida law); *Nat'l Union Fire Ins. Co. of Pa. v. Carib Aviation, Inc.*, 759 F.2d 873, 875 (11th Cir. 1985) (quoting *Hudson v. Prudential Prop. & Cas. Ins. Co.*, 450 So.2d 565, 568 (Fla. Dist. Ct. App. 1984)). The question of whether an exclusionary clause precludes coverage for damages is a question of law. *Fayad.,* 899 So.2d at 1084*; Dimmitt Chevrolet, Inc. v. Se. Fid. Ins. Corp.*, 636 So.2d 700, 701 (Fla. 1993).

---

[9]The complaint also alleges that the hull failure was the result of wear and tear and gradual deterioration, design defect, and manufacturer's defect. By my understanding of the facts, the damage to the hull was the result of the accumulation of rain water after the vessel had been refloated and placed in dry storage. It is not apparent to me that this damage to the hull is addressed on this motion. The parties should clarify this during the objection period.

[10]To this end, Plaintiff cites *Great lakes Reinsurance (UK) PLC*, 2007 WL 646981, at *3 (citing *Banco Nacional De Nicaragua v. Argonaut Ins. Co.,* 681 F.2d 1337, 1340 (11th Cir. 1982)).

Here, Axis claims that even if there is coverage, summary judgment is appropriate because the insurance contract expressly excludes the loss. In pertinent part, the policy states:

> **2. Exclusions:** We do not provide Property Damage coverage against or resulting damage from:
>
>> **a.** wear and tear, mechanical breakdown, gradual deterioration, corrosion, weathering, insect, mold, animals, marine life damage; . . .

(Doc. 1-2 at 7). In factual support, Axis again argues that it is undisputed that the vessel was grounded prior to Resmondo's purchase and that the grounding was the probable cause of the gimbal ring fracture which over time lead to a complete failure of the gimbal ring and the sinking of the vessel.[11] It argues further that, because the sinking resulted from wear and tear, gradual deterioration and/or corrosion of the gimbal ring, any and all damages arising from these conditions are excluded.[12] (Doc. 29 at 4-6).

In response, Resmondo urges that on the available evidence, including Plaintiff's expert testimony, the initial fracture of the gimbal ring and the subsequent fracture of the gimbal ring, rather than being due to wear and tear, normal corrosion, or ordinary usage of

---

[11]Axis cites *St. Paul Fire & Marine Ins. Co.*, and urges that, "[t]o determine whether the loss as a result of the partial sinking is covered under the policy, [the court] must apply the doctrine of proximate cause." (Doc. 29 at 5). As noted above, in analyzing problems of marine insurance causation, proximate cause has been explained as the ultimate, efficient cause(s) as opposed to the temporally remote cause(s). *Tillery v. Hull & Co.*, 876 F.2d 1517, 1519 (11th Cir. 1989). As such, courts have uniformly denied recovery where the ultimate cause of a vessel's damage was excluded from coverage. *See id.*

[12]The exclusion for manufacturer's defects is not argued on this motion.

18

the vessel, instead constituted a latent defect, which is a covered event in an all risks policy.[13]

He urges further that, even if the court determines that the damage resulted from excluded

causes, under Florida Statute § 627.409(2), Axis may not deny coverage unless it can

establish that the wear and tear and corrosion increased the hazard by a means within his

control.  Because he had no information or knowledge that the gimbal ring had been fractured

and the vessel otherwise appeared in normal condition at the time of purchase and during its

initial voyage, Resmondo contends that Axis may not avail itself of the exclusions.  (Doc. 37

at 8-9).

In reply, Axis urges that the fracture of the gimbal ring was not a latent defect

because it was the product of a gradual deterioration.[14]  Axis contends Resmondo's reliance

on *Walker* is misplaced in that the latent defect in that case was covered because the yacht

policy contained an *Inchmaree* clause[15] covering such, whereas the policy in this case

contains no such clause and specifically excludes the vessel's defects.  Axis also disputes the

applicability of section 627.409(2) of the Florida Statutes.  To the extent that it applies, Axis

contends summary judgment is still appropriate because it remains undisputed that Resmondo

purchased the vessel in a damaged condition, with evidence of a prior grounding seen on the

---

[13]In support thereof, Defendant relies on *Walker v. Travelers Indem. Co.*, 289 So.2d 864 (La. Ct. App. 1974).

[14]Plaintiff cites *Reisman v. N.H. Fire Ins. Co.*, 312 F.2d 17, 20-21 (5th Cir. 1963), for the proposition that a true latent defect is not a gradual deterioration but is a defect in the metal which was not discoverable upon a reasonable careful inspection.

[15]"[A]n Inchmaree clause significantly expands the hull insurer's undertaking by specifying coverage for a variety of perils in addition to the 'adventures and perils' of the sea specified in the ancient language of the standard policy."  *Thanh Long P'ship v. Highlands Ins. Co.*, 32 F.3d 189, 191 (5th Cir. 1994).

outdrives and the hull of the vessel before the purchase; and, when the vessel experienced engine failure after only one to two hours of operation, Resmondo docked it for two nights in its defective position which certainly increased the hazard by means under his control. Thus, even if § 627.409(a) is applicable under the circumstances, Axis urges that Resmondo's actions preclude recovery as a matter of law. (Doc. 45 at 5-5-6).

After considerable review, even in the light most favorable to Defendant, the facts and law dictate that his claim of loss is excluded under the policy. Given the uncontradicted evidence from Plaintiff's expert, the vessel sank due to the failure of the gimbal ring on the port outdrive, which was caused by wear, tear, and corrosion and deterioration over time. Wear and tear, corrosion and gradual deterioration, are plainly and unambiguously excluded from coverage in the policy. *See* (Doc. 1-2 at 7). The fact that this was initiated by a significant grounding that occurred prior to Defendant's purchase of the vessel does not alter the consideration on this point in light of the available evidence. Defendant offers no evidence to contradict that the gimbal ring ultimately failed as a consequence of wear and tear, corrosion and a resultant gradual deterioration. Nor does he proffer any evidence contrary to the opinion of Plaintiff's expert that the proximate cause of the sinking was the complete fracture of the gimbal ring.[16]

Resmondo's alternative arguments on this matter are not persuasive. First, Axis is correct that the case on which he relies, *Walker v. Travelers Indem. Co.*, is distinguishable in

_____

[16]His suggestion that the sinking was actually caused by the failure of the bilge pumps once the battery was exhausted fails to recognize that proximate cause in this context means the efficient cause of the loss not the most near in time cause. *See Lanasa Fruit S.S. & Importing Co.*, 302 U.S. at 562.

that the policy there at issue contained an *Inchmaree* clause specifically including latent

defects in the coverage provided. The policy in this case does not.[17] In any event, Resmondo

fails to proffer record evidence to support his assertion. Aside from his own visual inspection

of the vessel prior to purchase, he offers no evidence that the initial fracture of the gimbal

ring was one in which a reasonable customary inspection would not have revealed. As for his

reliance on § 627.409(2) of the Florida Insurance Code,[18] I conclude that it does not apply to

exclusions in a contract or policy of insurance. *See Nat'l Union Fire Ins. Co. of Pa..*, 759

F.2d at 879 (stating in dicta that section 627.409(2) embraces only a breach or violation by

the insured and thus does not apply to exclusionary provisions as there is nothing to breach or

violate); *U.S. Aviation Underwriters, Inc. v. Sunray Airline, Inc.*, 543 So.2d 1309, 1312 (Fla.

Dist. Ct. App. 1989) (concluding that, in adopting section 627.409(2), the legislature did not

intend to give an insured coverage which is expressly excluded from the policy); *but see*

*Pickett v. Woods*, 404 So.2d 1152, 1153 (Fla. Dist. Ct. App. 1981) (finding section

627.409(2) applicable to a policy exclusion to find coverage).[19]

---

[17]Even if it did, under the reasoning of *Irwin v. Eagle Star Ins. Co., Ltd.*, 455 F.2d 827, 830 (5th Cir. 1972) (applying Florida law), there was no defect in the gimbal ring as such, but only as a result of the grounding and wear and tear. Such is not a latent defect and thus there is no coverage under the policy.

[18]This provision states that, "a breach or a violation by the insured of any warranty, condition, or provision of any wet marine or transportation insurance policy, contract of insurance, endorsement, or application therefore shall not render void the policy or contract, or constitute a defense to a loss thereon, unless such breach or violation increased the hazard by any means within the control of the insured." Fla. Stat. § 627.409(2).

[19]The finding that section 627.409(2) is inapplicable to exclusionary provisions in this policy ends the discussion in light of Defendant's failure to produce any contrary evidence taking the loss out of the exclusion (or otherwise raising a factual dispute). However, I note that if the court determines to the contrary that this section is applicable to exclusions, then

The motion as for the claim at Count I should be granted on this ground

IV.

Accordingly, for the reasons set forth above, it is RECOMMENDED that **Plaintiff's**

**Motion For Summary Judgment, Statement of Undisputed Facts and Memorandum of**

**Law** (Doc. 29) be **GRANTED** as to Counts I (Express Contract Exclusions) and II (Lack of

Fortuity) and **DENIED** as to Count III (Breach of Implied Warranty of Seaworthiness). As

for Defendant's counterclaim for breach of contract,[20] it fails to the extent the court adopts

this recommendation as it is rendered moot by the rulings on Counts I and II.[21]

Respectfully submitted on this
8th day of May 2009.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

---

there would be a fact question on whether or not Defendant's conduct increased the hazard by means within his control and summary judgment on this ground would be precluded.

[20]By his counterclaim, Resmondo sues Axis for breach of the insurance contract. He seeks damages in repair costs of at least $125,000, plus sue and labor expenses incurred in preserving and protecting the vessel after it sunk, prejudgment interest from April 28, 2007, and reasonable attorney's fees and costs. (Doc. 14 at 6-8).

[21]As noted above, it is unclear to me the extent to which this motion was intended to address the loss/damages associated with the hull failure which apparently occurred after the vessel was on dry dock. The parties should clarify this during the objection period.

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.


Copies to:
United States District Judge
Counsel of Record