IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN ADMIRALTY

Case No. 8:08-cv-569-T-33TBM

April 13, 2009
Tampa, Florida

AXIS REINSURANCE COMPANY,

      Plaintiff,

vs.

TRAVIS RESMONDO,

      Defendant.

_____/

TRANSCRIPT OF DIGITALLY RECORDED ORAL ARGUMENT ON MOTION FOR
SUMMARY JUDGMENT
BEFORE THE HONORABLE THOMAS B. McCOUN III,
UNITED STATES MAGISTRATE JUDGE

Appearances of Counsel:

    For the Plaintiff:

        Mr. Michael Joseph Bradford

    For the Defendant:

        Mr. David F. Pope

Transcribed by:    Dennis Miracle, Official Reporter

1               P R O C E E D I N G S

2          THE COURT:  Good afternoon.  Have a seat.

3          MR. BRADFORD:  Good afternoon, Your Honor.

4          THE COURT:  Go ahead and call the case.

5          THE DEPUTY CLERK:  Matter of Axis Reinsurance Company

6 versus Travis Resmondo, Case Number 8:08-cv-569-T-33TBM.

7          THE COURT:  Okay.  We're calendared to take some oral

8 arguments here.  We record the proceedings electronically.  It

9 feeds off the mike there in front of you.  If you wish, you can

10 remain seated throughout; just speak into the mike.

11          If you want to come forward to the podium, that's

12 fine also, but I'm happy to have you remain seated.  Just speak

13 into the microphone there, if you wish.

14          Let's go ahead and state our appearances.

15          MR. BRADFORD:  Your Honor, good afternoon.  I'm

16 Mike Bradford here for the plaintiff, Axis Reinsurance Company.

17          MR. POPE:  David Pope, and I'm here for Travis

18 Resmondo.

19          THE COURT:  Okay.  The pleadings are with my law

20 clerk.  We're getting those brought in here.

21          What I want to do here is -- to begin arguments, I --

22 we've reviewed the pleadings, and I think I have a pretty good

23 understanding of where we are on this.  I thought that I would

24 benefit from having some oral arguments.

25          The -- let's sort of bounce back and forth here to

1  see if we can -- see if I can, from your oral argument, figure

2  out where we are on the law and also on the facts.

3      I have to say on a first reading I came away

4  thinking, you know, there's a lot of factual disputes here that

5  might make it inappropriate to grant the motion.  But on the

6  other hand, there's some arguments by the plaintiff here that

7  suggest that perhaps we can reach that point.

8      So I think you -- when I get the file here and I get

9  my notes, I think you can expect we're going to bounce back and

10  forth a little bit.  So if you can, try to stay with me on

11  this.

12      Let me go ahead and just begin -- let plaintiff

13  begin, and then we'll take it from there.  I think from my

14  perspective the -- I'd like you to sort of succinctly,

15  Mr. Bradford, succinctly indicate what you think the legal

16  issues are and why you think you can get a summary judgment

17  here in light of what appear to be a number of factual

18  disputes.

19      MR. BRADFORD:  Sure, Your Honor.  Actually, I think

20  there -- there is no factual dispute -- there are no material

21  issues of fact that are in dispute because Mr. Resmondo really

22  hasn't presented any facts that go to the issues in this case.

23      We have an expert on our side, John Smith, who

24  investigated the sinking and came up with a number of findings

25  and his expert opinions as to what caused the sinking.

1    Mr. Resmondo has presented nothing to contradict the

2 expert's findings and --

3    THE COURT:  That's one of my questions.  Mr. Pope, is

4 the defendant agreeing -- in agreement with the opinions

5 rendered by the expert in this case?

6    MR. POPE:  Your Honor, the -- may I?  The opinions of

7 Mr. Smith are quite interesting in that he opines several

8 things basically on speculation.

9    There is no evidence in the record that would

10 indicate what the condition of this vessel was on the day the

11 policy attached, which was August -- excuse me -- April 6,

12 2007.

13    There is some testimony or opinions that there was

14 some corrosion at a fracture in a gimbal plate that spread --

15    THE COURT:  Do you have anything to dispute that?

16    MR. POPE:  -- and propagated, but nobody knows when.

17 Nobody saw it.  Everybody is guessing about how far it went.

18 But we do know an event occurred, and that occurred on the 30th

19 of April when this vessel sank at Gallotti's Marine.  That's --

20 we do know that, and we know what happened on the 28th, which

21 is detailed by Mr. Resmondo.

22    THE COURT:  Let me ask you, again, does your client

23 have anything to dispute the opinion that this was -- that

24 there was evidence of corrosion and that it had occurred over

25 some period of time?

1          MR. POPE:  We have no -- nothing to dispute it

2    because nobody looked at it.  We never saw it.  We have no --

3    we did ask about the -- and you saw the testimony, I believe,

4    from Mr. Resmondo -- about the events between when he first saw

5    the boat at a boat show and then when he purchased the boat and

6    then what happened in between.

7          There is -- there has been testimony taken that would

8    indicate from the people at Thunder Marine that they declined

9    dispute -- refused to admit that there was a collision,

10   grounding or any other incident involving this vessel.  But

11   we -- that wasn't -- that was before we had anything to do with

12   it.

13         THE COURT:  Okay.  Let me go back to Mr. Bradford.  I

14   think that your suggestion that the facts really aren't in

15   dispute is well taken up to a point.

16         I think where -- and this is one of the areas where

17   I'm having some difficulty with the -- with your motion -- I

18   think the events between the April 6 date and April 30 date are

19   fairly well laid out and not really in dispute:  when he got

20   the boat, the obtaining of insurance, the -- the cruise they

21   took, the difficulties they had.  It seems to me you don't have

22   anything on your side to dispute that.

23         Where we get into a dispute is when your expert takes

24   a closer look at the part that I guess is described as a

25   gimbal --

1     MR. BRADFORD:  Yes, sir.

2     THE COURT:  -- and discovers what he thinks is

3  evidence of corrosion.  I agree with you up to a point.  I

4  think that certain of the facts are clearly not disputed.

5     I guess what is in dispute is the opinions and

6  conclusions he draws from that, whether or not there are facts

7  that the defendant can raise that call into question some of

8  those conclusions --

9     MR. BRADFORD:  And, Your Honor --

10     THE COURT:  -- and, beyond that, whether those

11  conclusions justify legal determination of summary judgment

12  that you're entitled to win, so it --

13     MR. BRADFORD:  I would -- I'm sorry.  I didn't mean

14  to interrupt, Your Honor.

15     THE COURT:  Go ahead.

16     MR. BRADFORD:  I would argue that there really is no

17  dispute about his findings or opinions either because

18  Mr. Resmondo --

19     THE COURT:  Well, there's no contrary expert, that's

20  for sure.

21     MR. BRADFORD:  There's no contrary expert, yeah, and

22  there's no testimony that contradicts the findings contained

23  within the report of Mr. Smith.

24     Mr. Resmondo, in fact, testified that the only thing

25  he knows about the cause of this sinking is what he learned

1 from Mr. Smith.  He doesn't contradict or take issue with

2 Mr. Smith's positions at all.

3        And it's Mr. Smith's position -- Your Honor,

4 obviously, is aware of what he determined -- but that there was

5 a grounding at some point of this vessel before Mr. Resmondo

6 purchased it.

7        THE COURT:  Okay.  Well, I understand that aspect of

8 it, one, that the defendant himself doesn't know whether that's

9 the case or not, although he --

10        MR. BRADFORD:  Right.

11        THE COURT:  -- apparently has conceded that he saw

12 some scratches or something on the --

13        MR. BRADFORD:  Yes, sir.

14        THE COURT:  -- drive shaft, and there may have been

15 some scratches on the bottom of the boat.

16        MR. BRADFORD:  Yes, sir.

17        THE COURT:  Is it from that evidence that your expert

18 draws the conclusion that there was a previous collision of

19 some sort?

20        MR. BRADFORD:  Not a collision, Your Honor; a

21 grounding.  He's --

22        THE COURT:  Well --

23        MR. BRADFORD:  -- determined there was a grounding

24 based on the scratches on the hull -- he observed these

25 things.  These aren't secondhand knowledge.  He observed these

1  things himself.  He took pictures of them.

2          I presented those to Mr. Resmondo at his deposition.

3  He acknowledged that those things -- those scratches were

4  there.  And they're not just minor scratches.  These are

5  significant scratches, scraping on the outboard stern drives,

6  and then there are also scratches and scraping on the hull of

7  the vessel.  Those things were there when Mr. Resmondo

8  purchased the vessel.  He testified to that in his deposition.

9          It's based on those scratches and other evidence --

10  the failure of the gimbal ring first among them -- that

11  Mr. Smith came up with a conclusion that there was a grounding

12  that overstressed this gimbal ring.

13          And that's further supported by the corrosion pattern

14  on the gimbal ring, Your Honor.  And the reason for that is

15  that part of it is corroded.  And Mr. Smith went so far as to

16  go out and take some materials the same as the gimbal ring and

17  test them, put them in water for 24 hours, saltwater, in the

18  same areas where this boat was operated and see what would

19  happen with those.  It takes time for this corrosion to build

20  up, significant amounts of time, not just 24 hours or a week or

21  whatever.  It takes time.

22          So part of the gimbal ring had this evidence of

23  corrosion, significant corrosion, this white, opaque covering,

24  and part of it didn't, which led him to the logical conclusion

25  that there was a -- this gimbal ring was overstressed in this

1  grounding, that it fractured partially, which is why we have

2  some corrosion on parts of it, have no corrosion on other

3  parts, and then it continued to operate under stress and

4  eventually fractured completely, then causing the bell housing

5  to break open and allow this vessel to flood.

6        And there's -- there's been nothing, again, presented

7  by Mr. Resmondo that would contradict that conclusion or those

8  findings.

9        THE COURT:  Mr. Pope, how about that?  I mean --

10        MR. POPE:  Yes, sir.  I'm -- I'm --

11        THE COURT:  The suggestion is you've got the expert

12  report with opinions that you can't contradict.

13        MR. POPE:  I'm going to go to the expert report.  The

14  metallurgist that he adopts and incorporates into his report --

15  I think it's IM -- IMF or IMR or something like that -- let me

16  get the right page.  It's in here somewhere.  Hold on just a

17  second.

18        It's IMR Test Lab.  The gimbal ring failure occurred

19  over a period of time.  Again, undefined.  It doesn't say

20  when:  between April 6, before April 6, after April 6, before

21  April 28, before April 30.

22        It was not the result of a single event which to me

23  addresses a little bit both the surveyor report and this

24  report.  The arguments of fortuity and wear and tear; the bell

25  housing was a singular event that occurred as a result of the

1   increased load after the gimbal ring failed.

2           We know when that occurred, and that was long after

3   April 6 when the policy attached.  That incident occurred

4   April 28 and is well documented in Mr. Resmondo's testimony

5   when the vessel's engines quit while he was at sea, and we know

6   when the big failure occurred.

7           The corrosion that was found on the gimbal ring

8   fracture faces originated at the bottom corner.  Again, no

9   time.

10          The corrosion was heavier in one area and decreased

11  in relation to distance from that -- the crack opened a period

12  of time.  Undefined.

13          As it opened, the metal came in contact with seawater

14  on the exposed fracture surfaces.  Again, no history of the

15  vessel between April 6 and the 28th.  For all anybody knows, it

16  could have been sitting in -- might likely have been sitting in

17  saltwater the whole time.

18          THE COURT:  Let's assume that the corrosion didn't

19  start until the 7th.  Does that make a difference?

20          MR. POPE:  The corrosion -- yes, it does, because the

21  policy attached, and then the duty on our part is different --

22  our duty is to not -- I guess the implied warranty of

23  seaworthiness would be that we don't knowingly take the vessel

24  to sea in a bad condition.  There is no evidence that

25  Mr. Resmondo knew or should have known of anything that was

1   wrong under that rubber boot.

2           I also wanted to --

3           THE COURT:  Is that a somewhat different issue,

4   though, than whether or not the cause of this was corrosion?

5           And I guess, Mr. Bradford, to you, the -- you're

6   going to have to convince me you're correct on the

7   seaworthiness issue.  There doesn't appear to be any evidence

8   that the defendant here was aware that this vessel was

9   unseaworthy.

10          Now, you make the argument that doesn't really

11  matter.

12          MR. BRADFORD:  It doesn't, Your Honor.  The law is

13  clear that it doesn't matter.  If the vessel was unseaworthy at

14  the inception of the policy, the policy is void.  He doesn't

15  have to have knowledge of it.

16          THE COURT:  Well, wouldn't that be, based on the

17  argument that Mr. Pope is just making, a question of fact as to

18  whether or not it was or was not seaworthy?

19          MR. POPE:  Correct.

20          THE COURT:  Regardless of what your findings -- your

21  expert findings were, you can't date them to a particular time.

22          MR. POPE:  Nor can IMR.  They didn't do it either.

23  They just said one area was more rusty than another.

24          And I would like to go back to a very -- because what

25  we're here about is a sinking, not a fracture of a gimbal

1  ring.  The sinking occurred two days later.  The vessel didn't

2  sink on April 28.  It didn't sink when whatever grounding that

3  has been speculated about occurred.  It didn't sink when

4  Mr. Resmondo brought it back to the dock from out in the Gulf

5  of Mexico.  It didn't sink when he left it there that day.  It

6  didn't sink the next day, the 29th, when it sat at Gallotti's

7  Marine.

8          He got a call on the morning of the 7th from the

9  harbor master at Gallotti's Marine, and the Gallotti

10 individuals called him and said, Your boat is sinking.  And

11 that's the event we're talking about.

12         This claim or this dispute is about the event of

13 April 30.  That's the event we're here about.  And the

14 evidence -- and I think it's the strongest evidence, and it is

15 from their surveyor -- in his conclusions and opinions he says

16 what happened:  The vessel took on water.  The bilge pump

17 dewatered the vessel until its battery was exhausted and then

18 it quit.  The vessel continued to flood.  The vessel sank.

19         We have an interesting juxtaposition -- and, again,

20 that is not our motion for summary judgment -- but there is a

21 theory available in insurance law in Florida and maritime law

22 that is called the concurrent cause theory.  And if there are

23 causes that could work or contribute individually each one of

24 which would account for an event, the sinking, and one of those

25 events is covered by the policy and one of them isn't, then

1    under the concurrent cause theory that's applicable -- and

2    nothing in maritime law says it isn't -- maritime law, in fact,

3    adopts it -- the cause that's covered is the one that's favored

4    because it is assumed that people buy insurance to protect

5    themselves.  And if the concurrent cause is one that's

6    covered --

7            THE COURT:  Which cause would be favored here?

8            MR. POPE:  The concurrent cause would be that this

9    was an all risk policy.

10           THE COURT:  All right.

11           MR. POPE:  It's very, very clear if one reads the

12   Part D --

13           THE COURT:  Do you agree with that, Mr. Bradford,

14   that this is -- it reads as if it's an all risk policy?

15           MR. BRADFORD:  Yes, sir.  It is an all risk policy.

16           THE COURT:  Okay.  So we're there.  Beyond that,

17   what's your argument?

18           MR. POPE:  None of the exclusions under Part D, which

19   deal with wear and tear -- there's no evidence that any -- that

20   there was any wear and tear here, certainly not while

21   Mr. Resmondo owned the vessel or from April 6 onward -- that no

22   evidence of any of the -- of the exclusions and under the

23   general exclusions, which is Part B, there are no evidences of

24   any -- of the general exclusions applying.

25           So we have an event of April 30, a sinking when a

1  bilge pump stopped working because Mr. Resmondo didn't plug it

2  into shore power, and it finally ran down and it sank.  That's

3  the event we're here about.  That event is covered by the

4  policy.

5         THE COURT:  Mr. Bradford?

6         MR. BRADFORD:  Your Honor, that -- that's a -- with

7  all due respect to Mr. Pope, that's a nonsensical argument.

8  He's arguing that the ship -- the boat sank because the bilge

9  pump stopped working.  The bilge pumps were pumping out water

10  that was flowing into the vessel because of this failure of the

11  gimbal ring.  It only prolonged the sinking by a couple of

12  days.  The failure of the bilge pumps because they weren't

13  plugged in to shore power by Mr. Resmondo did not cause the

14  sinking of the vessel; they only delayed the sinking of the

15  vessel by a couple of days.

16         What we have here, Your Honor, is a case where

17  Mr. Resmondo purchased this vessel, this boat, on April 7 --

18  excuse me -- April 6, 2007.  Three weeks later he took it out

19  for the very first time, and this event occurs.  He hears this

20  pop.  The engines aren't operating.  He has to nurse it back to

21  shore on one engine.

22         There's been no evidence presented by Mr. Resmondo as

23  to what caused this to happen.  However, we have presented

24  significant evidence in the form of the findings and opinions

25  of Mr. Smith that haven't been contradicted that it was caused

1  by the failure of this gimbal ring and that this occurred over

2  a significant period of time, as he wrote in his report.

3          And he wrote specifically in his report, Your Honor,

4  that this failure, the initial failure, occurred before

5  Mr. Resmondo bought the boat.  It would have happened when

6  this -- the vessel was being operated by Thunder Marine.

7          And, unfortunately, I don't know why, but

8  Mr. Resmondo has not looked to Thunder Marine or the

9  manufacturer, but this would have occurred when Thunder Marine

10  was using the boat as a demonstrator.

11          And the evidence shows -- the scrapes, the marks on

12  the hull and on the outdrive show that there was a grounding.

13  Also, sand found within the engines by Mr. Smith demonstrates

14  that there was a grounding, but it was not a recent grounding.

15          So there was a grounding that overstressed this

16  gimbal ring -- this is his opinion; these are his findings --

17  overstressed the gimbal ring to cause it to fracture partially,

18  which is the reason we have some corrosion on parts of it, no

19  corrosion on other parts of it.

20          It then continued to be operated, continued to take

21  the wear and tear on that fractured gimbal ring, and eventually

22  the whole thing fractured causing the bell housing to tear and

23  causing the vessel to sink.

24          This was an inevitable sinking.  This was going to

25  happen at some point, and that's one of the reasons this is not

1    covered, Your Honor.  This is -- this is not a fortuitous

2    loss.  If it's inevitable, if it's something that was going to

3    happen -- and, in fact, this district in International Ship

4    said that fortuitous events -- and the Court is citing

5    Sivowitz, which is a Southern District of New York case --

6    fortuitous events or accidents or casualties of the seas,

7    unforeseen and unexpected events, and are not losses occasioned

8    by the incursion of water into a vessel's hull owing to the

9    defective, deteriorated or decayed condition of the hull or

10   ordinary wear and tear.

11        We have essentially the same situation here,

12   Your Honor.  We have a damaged gimbal ring that continues to

13   take stress, continues to suffer wear and tear, and eventually

14   fractures completely and results in the sinking of the vessel.

15        So it's not a fortuitous loss.  And, therefore, even

16   though this is an all risk policy, it's not covered,

17   Your Honor.

18        It's also not covered because it's excluded by the

19   terms of the policy which exclude wear and tear, mechanical

20   breakdown, gradual deterioration.

21        THE COURT:  Don't you think there's a question of

22   fact on the fortuity issue?

23        MR. BRADFORD:  A question of fact?

24        THE COURT:  On the fortuity issue such that, you

25   know, in the light most favorable to defendant, which is the

1   way I have to look at this motion, that -- that he can

2   establish there's coverage?

3           MR. BRADFORD:  I don't think there is, Your Honor,

4   because this, again, was an inevitable sinking.  This was going

5   to happen at some point.  And that's, frankly, supported by the

6   fact that it happened the very first time he took it out.  He

7   didn't have this vessel for a year or two.  The very first time

8   he took it out this occurred.  And that's because this gimbal

9   ring was in this weakened state and was going to fracture at

10  some point and cause this sinking.

11          My other point, Your Honor, would be that even if the

12  first couple of reasons for -- for summary judgment don't favor

13  us -- and, again, I argue they do -- this clearly was an

14  unseaworthy condition, and the law is clear on this,

15  Your Honor, that under the federal law -- and state law doesn't

16  apply; federal law applies -- the law is clear on that also --

17  if the vessel is unseaworthy at inception, whether the vessel

18  owner had knowledge of it or not, there's no coverage.  The

19  policy is void ab initio.

20          THE COURT:  What do you say to that --

21          MR. BRADFORD:  And, Your Honor --

22          THE COURT:  -- Mr. Pope?

23          MR. POPE:  Two things, Your Honor.  Number one, the

24  fracture which seems to be the focus point of everybody's

25  attention occurred clearly on the 28th, which was a month after

 1   the insurance had been bound.

 2          There is no evidence that anything -- everybody is

 3   just guessing what happened before that.  We don't know.  We

 4   don't know, and there's -- and I'm -- I just -- I don't -- how

 5   can Mr. Resmondo -- he asked the questions.  They said no,

 6   nothing happened.  Those people have been deposed.

 7          We didn't file those depositions because they didn't

 8   seem to be -- it doesn't establish anything; it's just another

 9   negative.  Nobody -- they don't know what happened to it

10   either.  At least that's their testimony.  But --

11          MR. BRADFORD:  Your Honor?

12          THE COURT:  The argument about the seaworthiness --

13          MR. POPE:  The --

14          THE COURT:  -- the fact that it doesn't hinge on

15   whether or not he knew it was seaworthy or not under the

16   federal version, you argue, I think, in your pleadings that

17   under Florida State law --

18          MR. POPE:  Your Honor, in terms of the warranty of

19   seaworthiness, I think there are probably two things that are

20   at minimum involved in the -- the Wilburn boat case says you

21   look to see first if there is an entrenched federal maritime

22   rule.  And I think the utmost good faith rule has clearly been

23   recognized as one that is entrenched in maritime law.

24          And the warranty of seaworthiness -- and I have to be

25   careful because there's a difference -- there's an American

1   rule, and the American rule has two components.  One, is the

2   vessel seaworthy at the time risk attaches?  That's April 6 in

3   this case.

4          Number two, thereafter there's an implied negative

5   warranty that the insured doesn't do or take knowingly or by

6   carelessness take the vessel to sea in a condition that's

7   unseaworthy.  There is no evidence in this case that after

8   April 6 or on April 28 that Mr. Resmondo did anything other

9   than act with reasonable prudence operating his vessel.

10         And I again come back to the circumstance that on

11  April 28 the fracture, which is the event -- if I understand

12  counsel and Mr. Smith's report, is the event which led to the

13  intrusion of the water -- nobody has suggested there was any

14  intrusion of water into the vessel before that date.  That also

15  was within the terms of the policy.  It's a fortuitous event in

16  that it was not due to any fault, neglect or want of care on

17  the part of Mr. Resmondo.

18         And even if it were, this is an all risk policy, and

19  it covers his negligence; for instance, his failure to make

20  sure the vessel was plugged into shore power when he left it

21  there, and it appeared okay to him and floating on an even keel

22  the night the fracture occurred when he left it at Gallotti

23  Marine with a note on it.

24         THE COURT:  As I understand it, your argument on --

25  to pick up at this point, your argument is that, by way of your

 1   expert's testimony, whatever happened on the 28th cannot be

 2   viewed as fortuitous simply because it was inevitable.  Given

 3   the wear and tear of the gimbal, at some point it was going to

 4   give, and this was the inevitable result, is that correct?

 5           MR. BRADFORD:  That's accurate.

 6           THE COURT:  And that's what makes it non-fortuitous?

 7           MR. BRADFORD:  That's -- it's why it's

 8   non-fortuitous, Your Honor.

 9           Also, again, the vessel was clearly unseaworthy.  It

10   was not suited to the purpose for which it was intended.  It

11   was --

12           THE COURT:  Wouldn't the circumstances -- our

13   research suggests that you're correct, that the federal rule

14   would apply in these circumstances.  I'm not sure Mr. Pope is

15   disagreeing with me or sidestepping my question.

16           Our research suggests that the federal rule would

17   govern on that point, but doesn't -- doesn't he have the right

18   to argue as a matter of fact that when the policy was secured

19   on the 6th it was seaworthy?

20           MR. POPE:  The gimbal ring wasn't cracked that day.

21           MR. BRADFORD:  That's simply not accurate,

22   Your Honor.  He's presented --

23           THE COURT:  Well, it was a worn gimbal plate.

24           MR. BRADFORD:  He's presented no facts, no evidence

25   to support that --

1        MR. POPE:  It's his expert that says that.

2        THE COURT:  Well, we know that.  Even from your --

3   from your expert --

4        MR. BRADFORD:  No, sir.

5        THE COURT:  Your expert testimony is that it didn't

6   happen between the 6th and the 28th, that this was a -- was a

7   problem that was older than that and over a period of time --

8        MR. BRADFORD:  Yes, sir.

9        THE COURT:  -- this was the result, correct?

10       MR. BRADFORD:  Yes.  In fact, he states --

11       THE COURT:  Wouldn't that allow him to argue -- I

12  mean -- let me back up and say that I think that aspect of your

13  expert's report maybe is inconsistent with what you're

14  suggesting.  But by all appearances this boat was seaworthy on

15  the 6th.

16       MR. BRADFORD:  No, sir.  No.

17       THE COURT:  Why not?

18       MR. BRADFORD:  It wasn't.  That -- that's -- maybe I

19  haven't said it clearly or maybe I misunderstood your question

20  before.  But it wasn't seaworthy.  This isn't something that

21  occurred on the 28th.  It was completed, if you will, on the

22  28th.  This thing was put in the water on the 28th with this

23  already fractured gimbal ring -- overstressed, fractured,

24  damaged gimbal ring.

25       THE COURT:  Well, we don't know that, do we?  All we

1  know is that there was --

2          MR. BRADFORD:  Well --

3          THE COURT:  -- there was a gimbal ring which showed

4  corrosion which, by your expert's opinion, would have occurred

5  over a period of time sometime before the 6th.

6          MR. BRADFORD:  It is -- and that is -- it is his

7  conclusion that it was put in the water in that condition,

8  Your Honor, because it's something he said started before --

9  and he says this in his report -- this started before

10 Mr. Resmondo purchased the boat.

11         THE COURT:  All right.  Well, let's just -- does that

12 make it unseaworthy, the fact that it had a corroded gimbal

13 ring?

14         MR. BRADFORD:  Oh.  Yeah.

15         THE COURT:  My guess is there's probably a thousand

16 boats out there today that would be in the same --

17         MR. BRADFORD:  No.  No, Your Honor.  It's not just a

18 corroded gimbal ring.  It's corroded on the face where the

19 fracture occurred.  In other words, it's corroded on the inside

20 because it was fractured not on the exterior of the -- on the

21 surface of it.  It's cracked.  And if I had something here, I

22 would kind of demonstrate what I'm trying to say.

23         But the gimbal ring is cracked open partially, and

24 that section where it was cracked was exposed to saltwater.

25 And that's where the corrosion occurred on the crack -- you

1  know, interior surface of the gimbal ring.

2          Then when he put it in the water on the 28th, the

3  thing just cracked the rest of the way, so it was already

4  damaged, cracked, bound to fail when he put it in the water on

5  the 27th and when he bought it and took out the insurance

6  policy on the 6th.  That's the opinion of Mr. Smith.

7          THE COURT:  What are you waving there, Mr. Pope?

8          MR. POPE:  I'm reading from Mr. Smith's report:

9  After the partial fracture occurred, the vessel continued

10  operation with the gimbal ring in its weakened state.  That

11  continued until a brief voyage under Mr. Resmondo's command on

12  April 28, 2007.  Even he says that's when it happened.  On that

13  day, April 28, 2007, the gimbal ring broke all the way

14  through.  The vessel was driven to a nearby marina where a day

15  and a half later it was found sunk.  He says it happened on

16  April 28.

17          MR. BRADFORD:  That -- that's not accurate,

18  Your Honor.  Mr. Pope just said it himself.  Mr. Smith said

19  this started before.  This was already in a damaged state.  And

20  he says in his conclusions and opinions this vessel sank due to

21  the significant failure of the port outdrive.  He's talking

22  about the gimbal ring.  He says, quote, that failure began

23  before Mr. Resmondo bought the vessel.  I don't -- there's no

24  logical conclusion other than that this was an unseaworthy

25  vessel, Your Honor.

1            THE COURT:  What's the definition of "seaworthy"?

2  Where do I look for that?

3            MR. POPE:  A vessel reasonably fit for the purpose

4  intended.

5            MR. BRADFORD:  Yes, sir.  I don't -- I don't think

6  anyone can argue --

7            MR. POPE:  This was a 40-foot Baja pleasure vessel,

8  so...

9            MR. BRADFORD:  I don't think anyone can argue

10  logically that a vessel that is put in the water in this

11  condition -- again, there's no evidence, nothing -- no

12  testimony to contradict the findings and opinions of

13  Mr. Smith.  There's -- there's no logical argument that a

14  vessel put in the water in this condition that then fails

15  within a couple of hours and sinks is seaworthy, Your Honor.

16            MR. POPE:  The problem is --

17            MR. BRADFORD:  And if it's not --

18            MR. POPE:  -- that all occurred on the 28th.  By his

19  own opinion, it failed on the 28th.

20            MR. BRADFORD:  That -- that's a --

21            MR. POPE:  That's a month after the policy goes into

22  effect.

23            MR. BRADFORD:  Your Honor, that's not an accurate

24  reading of Mr. Smith's opinion or his findings.  He says,

25  again, unequivocally that this began before Mr. Resmondo bought

1 the vessel.

2       Now, Mr. Resmondo could have, of course, retained his

3 own expert.  And if he feels these conclusions aren't valid,

4 maybe he could have come up with a different conclusion,

5 although I suspect if he retained a reasonable and objective

6 expert, we would have gotten to the same conclusion.

7       And, again, I would point out, Your Honor, that

8 Mr. Resmondo testified that he has no reason to contradict or

9 to not believe the conclusions of Mr. Smith.  The only thing he

10 knows about why the vessel sank is what he learned from

11 Mr. Smith.

12       MR. POPE:  Plus the hole in the outdrive that was

13 seen later.  Actually, though, he didn't see it.

14       MR. BRADFORD:  And, Your Honor, I just want to

15 address one thing briefly.  Mr. Pope has referred a couple of

16 times to testimony from people from Thunder Marine.  That's not

17 before the Court.  If Mr. Resmondo wanted to put those

18 transcripts before the Court, he could have done that, but --

19       MR. POPE:  Your Honor, I don't --

20       MR. BRADFORD:  -- the reason they're not is because

21 they really don't have much to tell us.  Thunder Marine's

22 testimony would have been self-serving.  And since Mr. Pope

23 brought it up, the man from Thunder Marine testified that the

24 scrapes and marks weren't on the outdrives when they sold it to

25 Mr. Resmondo.  Mr. Resmondo testified that they were, that he

1  stood there and he inspected the vessel when he bought it, and

2  those marks and the scrapes were there.

3         (Pause.)

4         MR. BRADFORD:  Again, if I may, Your Honor?  In the

5  very first page of the report, Mr. Smith says that the cause of

6  this failure was a metal fracture that occurred before

7  Mr. Resmondo bought the boat.

8         MR. POPE:  And he contradicts himself three pages

9  later.

10         MR. BRADFORD:  There's no contradiction, Your Honor.

11  I think it's entirely consistent.

12         MR. POPE:  On that day the gimbal ring broke all the

13  way through, 4-28-07.  That's what he says.  It wasn't broken

14  all the way through on April 6.  Nobody knows how big a

15  fracture there was on April 6.  Nobody knows -- not Mr. Smith,

16  not IMR.  Nobody.  We're not going to have any testimony about

17  that, because nobody observed it or saw it.

18         MR. BRADFORD:  Your Honor, again, it's his opinion

19  that this fracture started before the vessel was purchased, and

20  that's the only expert opinion we have in evidence.

21         (Pause.)

22         MR. BRADFORD:  And, Your Honor --

23         THE COURT:  I indicated a moment ago, Mr. Bradford, I

24  think you're correct on the -- on the seaworthiness issue in

25  terms of the application of federal law.  Mr. Pope argues that

1   under Florida law the result would be different because it

2   might hinge on the defendant's knowledge.  You make the

3   argument that you win either way.  And how is that?

4          MR. BRADFORD:  The defendant, the insured, doesn't

5   have to have knowledge of the unseaworthy condition.

6          THE COURT:  Under the federal --

7          MR. BRADFORD:  Yes, sir.

8          THE COURT:  Okay.

9          MR. BRADFORD:  And if you'll notice, Your Honor, in

10  their response they cited to the Florida statute, but they

11  cited no cases supporting the conclusion that the statute --

12         THE COURT:  Well, wouldn't the Florida statute

13  suggest --

14         MR. BRADFORD:  No, sir.

15         THE COURT:  -- there's a requirement of knowledge?

16         MR. BRADFORD:  No, sir.

17         THE COURT:  (Indiscernible.)

18         MR. BRADFORD:  The law is -- and it's their -- there

19  are a multitude of cases on this -- the law is that if there's

20  an established federal rule -- and there's, again --

21         THE COURT:  I know that.

22         MR. BRADFORD:  -- a multitude of cases saying that

23  there is a --

24         THE COURT:  I understand that.  You've cited to the

25  Supreme Court case.  That's probably the only one I really need

1  to know about for that rule.  But if we decide for some reason

2  that that's not applicable -- he makes the argument -- Mr. Pope

3  makes the argument that it's not -- under the Florida insurance

4  code, you can't show that there was any knowledge of this

5  and --

6           MR. BRADFORD:  Well, Your Honor, actually, I would

7  argue that --

8           THE COURT:  You make the argument in response, well,

9  it really doesn't matter; we win either way.  There was an

10 increased peril here --

11          MR. BRADFORD:  Well, because the -- the -- the loss

12 is excluded under the terms of the policy and because it's a

13 non-fortuitous loss.  Even if -- even if that Florida Statute

14 applied, it's still excluded.

15          But I would argue, Your Honor, that Mr. Resmondo did

16 have warning or an indication that there was some -- something

17 amiss with the vessel, because he inspected it and saw the

18 condition of the outdrives and the hull.  And I would say that

19 that puts him on notice that there is something wrong with the

20 vessel.

21          MR. POPE:  Your Honor, we cited the Florida statute

22 about a breach or a violation of any warranty condition or

23 provision, and it has to increase the hazard by some means

24 within the control of the insured.  There are cases dealing

25 with that provision.  It's the -- but Wilburn Boat says you

1   look to see if there's an established federal rule.  If there
2   isn't, then you look to state law.

3          So the first inquiry is to see if there's an
4   established federal rule.  The established federal rule, as I
5   understand it, is that the vessel must be seaworthy at the
6   inception of the policy, which is the Supreme Court case, and
7   that thereafter there is an inverse or reverse or implied
8   warranty that the vessel will be maintained in a seaworthy
9   condition.  There's a couple of variations of that -- that the
10  insured will not take the vessel to sea in a knowingly and an
11  unseaworthy condition.  It's called an implied reverse
12  warranty.

13         But those implied reverse warranties, just like the
14  warranty of seaworthiness, have had this Florida statute
15  applied to them.  That's what the Wilburn Boat case was about.
16  Whether a warranty in Texas or Louisiana would apply about a
17  vessel that was used -- I think that one was about a commercial
18  use warranty as opposed to private pleasure use -- and
19  ultimately the federal -- the Supreme Court said look to the
20  state law, and they did.  And there was -- you know, there was
21  some provision in Texas law similar to this.

22         My point is that when we come to the implied
23  warranties and warranties other than -- I think it's clear --
24  and I know there are Eleventh Circuit cases on the utmost good
25  faith that says that is an entrenched policy of federal

1  maritime law, and that would supersede the Florida statute had

2  Mr. Resmondo improperly applied for insurance, in other words,

3  he made a representation, or whether it was knowing or not

4  knowing when he applied for the insurance that was untrue and

5  misled the underwriter.  But we're not really talking about

6  that utmost good faith here.

7              MR. BRADFORD:  No --

8              MR. POPE:  The three things that were raised were

9  seaworthiness -- seaworthiness, wear and tear and fortuitous

10 loss.

11             MR. BRADFORD:  Your Honor, that's -- Mr. Pope said

12 what I was going to say, basically that uberrimae fidae has

13 nothing to do with this.  We're talking about seaworthiness.

14 And there is an established, entrenched federal rule that

15 seaworthiness -- that the seaworthiness -- it's a federal rule,

16 Your Honor.  So we don't look to the state law.  And the state

17 law is clear on that, even Florida law.

18             And we cited to a Florida case, the Aetna case --

19 Aetna v. Dudney, where the Court said state law cannot be

20 utilized to interpret a warranty in a marine insurance contract

21 if the federal judiciary has established a rule as to the

22 interpretation of that type of warranty.

23             There's case after case, Your Honor, federal case,

24 applying the implied warranty of seaworthiness.  So it's an

25 established, clear federal rule.  For that reason the Florida

1  law wouldn't apply.

2          In fact, I would cite to a Middle District case,

3  Your Honor, the Connecticut Indemnity Company v. -- and I know

4  I'm going to get this wrong -- Pavlavoda, I believe it is,

5  where the Court said -- stated that the absolute implied

6  warranty of seaworthiness applies the instant the policy comes

7  into effect.  To succeed in asserting this warranty, the

8  insured need not demonstrate that the insured had knowledge of

9  the unseaworthy condition nor that the insured was somehow at

10  fault in not discovering the unseaworthy condition.  It is

11  enough to discharge the insurer if the vessel is, in fact, not

12  seaworthy at the inception of the policy.

13          MR. POPE:  That's what I thought we said.

14          THE COURT:  Part of your argument -- in a couple

15  places in your argument you reference manufacturer's defect.

16  You have no proof of there being a manufacturer's defect here,

17  do you?

18          MR. BRADFORD:  No, Your Honor.  I think we did that

19  because of the language in the policy, and we kind of -- we

20  were quoting language from the policy, but...

21          THE COURT:  It's really the wear and tear and the

22  fortuity of the warranty?

23          MR. BRADFORD:  Yes, sir.  I think there's, if you

24  will, a defect in this gimbal ring, but it was caused by the

25  grounding.  It was damaged by the grounding.

1          And there's no evidence by the way, Your Honor, that

2     this boat -- that this vessel was grounded between the time

3     Mr. Resmondo bought it and the first -- very first time he took

4     it out.  It's Mr. Smith's opinion that this -- the initial

5     damage to the gimbal ring was caused by a significant

6     grounding.  There's no evidence whatsoever of a grounding

7     between the time Mr. Resmondo bought this vessel and the first

8     time he took it out.  So, therefore, it had to have occurred

9     before he bought it.

10          THE COURT:  I mean, there's nothing to contradict his

11     testimony that he didn't take it out until the day this all

12     occurred, the 28th?

13          MR. BRADFORD:  Yes, sir.  He said that's the first

14     time he took it out.

15          THE COURT:  So that would be --

16          MR. POPE:  There is evidence the boat was used,

17     though.  He mentioned that he had gone out on a couple of sea

18     trials in between and that Thunder Marine was doing work on the

19     boat.  That's in his deposition testimony that we cited to the

20     Court.

21          MR. BRADFORD:  And the damage to the outdrives and

22     the hull of the vessel indicate that this grounding took place

23     before he bought it, because he testified that they were

24     present when he bought the vessel, Your Honor.

25          THE COURT:  The only way to interpret -- let me ask

 1  it this way:  On this motion, am I required to accept the

 2  conclusions from your expert?

 3          MR. BRADFORD:  I -- yes, Your Honor.  I believe so.

 4  There's no evidence to contradict his conclusions or his

 5  findings.

 6          THE COURT:  Isn't the argument that counsel makes

 7  here raising questions about the accuracy of the opinions or

 8  the veracity of the opinions enough to in this circumstance

 9  where I've got to view the facts in the light most favorable to

10  him sufficient to raise questions of fact?

11          MR. BRADFORD:  No, Your Honor, because there is no

12  credible evidence that contradicts any of his findings or

13  opinions.

14          MR. POPE:  The credible evidence is in his own

15  report.

16          MR. BRADFORD:  Again, that's --

17          MR. POPE:  I don't know -- I don't know what else

18  we've got to do.  He said it fractured on April 28.  That's --

19  his expert said that.  Before that there was --

20          THE COURT:  That's not --

21          MR. BRADFORD:  Your Honor, I think --

22          THE COURT:  That's not the only thing he said.

23  That's not the only thing he said.

24          MR. POPE:  I understand he said there was something

25  that he thinks happened before that, but nobody knows when.

1            MR. BRADFORD:  No.  He said it was --

2            MR. POPE:  He doesn't know when.  Nobody else does.

3            MR. BRADFORD:  He said the fracture started before

4    that.  And, Your Honor, I don't want to beat this to death --

5            THE COURT:  Well -- (indiscernible) --

6            MR. BRADFORD:  I think the Court understands --

7            THE COURT:  -- the report very carefully before we do

8    anything on this.

9            Has the scheduling order been reconfigured for you on

10   this?

11           MR. POPE:  Yes, sir.  Yes.

12           MR. BRADFORD:  Has it?

13           MR. POPE:  Yes.

14           THE COURT:  All right.

15           MR. POPE:  Yes.  This is a Judge Covington case, and

16   the scheduling order moved the trial back to June.

17           MR. BRADFORD:  Yes.  I'm sorry.  That's -- I thought

18   you -- I thought you meant since then, Your Honor.  I

19   apologize.

20           MR. POPE:  And the pretrial is May 13 or 15th or

21   something like that.

22           MR. BRADFORD:  Yes.  That's accurate.

23           MR. POPE:  But it's -- Judge, it's in a -- it's in

24   one of these little electronic things -- it's not an order --

25   the rescheduling thing.

1          THE COURT:  Okay.

2          MR. POPE:  There's no per se order that she entered

3  in a pleading.

4          THE COURT:  All right.  Thank you.

5          MR. BRADFORD:  Thank you, Your Honor.

6          MR. POPE:  Thank you.

7          (Thereupon, the proceedings in this case for this

8  date were concluded at this time.)

9

10

11

12

13

14

15

16

17

18                    C E R T I F I C A T E

19          I, Dennis Miracle, Official Court Reporter, do hereby
   certify that the foregoing proceedings were transcribed by me
20  from a digital record that was produced by the United States
   District Court for the Middle District of Florida, Tampa
21  Division, and is a true and accurate record of said proceedings
   to the best of my ability, **based on the quality of the**
22  **recording.**

23

24   s/Dennis Miracle                    July 21, 2009
   _____        _____
25      Dennis Miracle                      Date